Good morning, Your Honors. If it pleases the Court, my name is Stanley Dale Radke, and I'm the attorney on behalf of Petitioner in this matter, Mr. Najarro-Portal. He brings a petition for review of an agency decision below, specifically the Board of Immigration's appeal of denial of his appeal from the denial of asylum, withholding, and protection under the Convention Against Torture from the Immigration Court here in San Francisco. Petitioner raised essentially three claims in his petition. The first one I'd like to touch on is the serious nonpolitical crime bar that was held both by the IJ and the Board in their decisions. And the posture of this case is that there's two decisions. There's two decisions by the immigration judge and two decisions from the Board because the Board remanded it down. But in all four of those decisions, there was a bar to his withholding application. Petitioner conceded he wasn't eligible for asylum because he didn't file within the one-year time period. But in all of these decisions, the holding was that he was precluded from seeking withholding because of a conviction. And that's actually the language. Kagan. It wasn't because of a conviction. It wasn't because of a conviction is my understanding. It was because they had reason to believe that he did this. That's different, isn't it? Well, it is different, but if you actually look at the language of the decisions, it is ‑‑ it specifically says, and I'm quoting here from the certified record, page 9, and this is the Board's decision. It says, the immigration judge found Respondent is not eligible for asylum withholding of removal because he committed a serious nonpolitical crime outside of the United States robbery for which he was convicted and then sentenced to 16 years. And because his conviction. So what Petitioner is raising in this case is that he was convicted in absentia. I think the record is clear that he never saw the judge. He testified in declarations and on the witness stand that he never even saw his defense attorney. He learned for the first time that he had been convicted two years after the fact. But suppose ‑‑ let's take the statutory standard, okay? I mean, they mention the conviction, I suppose, as evidence of the fact that he actually did this thing, but that's not what the statute requires. It doesn't have to be convicted. So the question is, is the record insufficient to support the conclusion that there was reason to believe that he did this? Petitioner would argue no, because if you go back to the IJ's decision, it's actually And this is on page 67 of the record. Third paragraph, the immigration says, during the removal proceedings, the government submitted proof. That's error. The government submitted no proof. This was Respondent's documents that he submitted in his prison record. So that's ‑‑ that's wrong. So what difference does that make? Well, Petitioner's claim was ‑‑ I'd go on to the rest of the case, if I were you. Okay. Well, I would just ‑‑ one more point is that the cases that are cited for authority here, which is the matter of EA, the Board decision, and the GO decision, in both of those decisions, there was testimony of the Respondent, the Petitioner, that they committed these acts. In this case, Mr. Naharro-Portal has adamantly denied that he was involved in this. Well, I confess ‑‑ we have not discussed this case beforehand among the three of us, but I confess I share Judge Berzon's view that there's enough here in the record to support a conclusion that there's some reason to believe that he did it. Okay. For me, the question is whether or not there's enough here for your client to give him deferral of removal under cap. That's the open question for me. Okay. So the question ‑‑ those are the two remaining issues. One is the adverse credibility finding that discounted, in essence, all of his testimony in the record that was submitted. And I would refer back to the first Board decision that on the same record said that there was clear error. Well, it's not quite the same record. After remand, I.J. took additional evidence. He came to the same conclusion. Right. And I'm not sure the additional evidence said a lot in deal ‑‑ a lot different from what the previous evidence did. But he had ‑‑ there were further proceedings. There were some further proceedings. There was ‑‑ in essence, what happened is the immigration judge kept asking counsel for the full 1,000‑page prison record that allegedly he had obtained from the judge in El Salvador. And the counsel, Mr. Naharro Portel's counsel, told the judge that he was doing this pro bono, that he had been stopped getting paid, and the cost of translating all of these documents was prohibitive. And so that was really one of the reasons that the immigration judge said, look, I gave you the chance to augment the record, and you didn't. So that's one of the basises. And then there's the testimony also of that same counsel, Mr. Mirra, who in the remand proceeding said, look, I talked to this judge who was overseeing his detention, and she was unable to give a declaration because she told Mr. Mirra that she would need the approval of the Supreme Court in El Salvador before she could get involved in this decision or in this proceeding in the United States. And what Judge Murray, the immigration judge, said, well, can we get a DHS waiver? And that was never followed up upon. So there's the — granted, it's hearsay testimony, but there's the testimony from — What would a DHS waiver have done? If she needs a permission from the El Salvador Supreme Court, what does DHS have to do with that? I don't understand the waiver proposition. Yeah. I don't fully understand that, but that's in the discussions about the record and having this witness testify, this judge from El Salvador. The immigration judge said, hey, let's get a DHS waiver. But I think what's important in this case is that the immigration judge, right from the beginning, discounted the petitioner's claim without even having any evidence. I mean, I would just look to the very first hearing, which was in January 12th of 2011, and this is the hearing in front of the immigration judge where the I-589 asylum withholding application is submitted to the court. And so the judge is receiving this application for the very first time and taking a cursory glance at it at the bench. And he says here on page 403 of the record, and when I read the documents, it appeared to me, and I'm just saying, it appeared to me that there were several very important contradictions with your story. I haven't heard your testimony. I haven't heard the evidence, so I haven't made up my mind, but I want to alert you that it certainly looked from the documents that there are problems. And he goes on in a couple of sentences. That does not give you the right to make up stories in order to get political asylum. So without even hearing testimony, the judge had already looked at the application and said, I'm not buying this. Well, I do note, and I'm going to ask the government about this, the denial rate of this I.J. is absolutely extraordinary. His denial rate is 97.3 percent of the cases that come in front of him. By comparison, the denial rate in San Francisco where he sits, the average of the other judges, the denial rate is just under 47 percent. This is not a judge that anyone seeking relief in the United States ever wants to appear before. That's true, Your Honor, and I actually have appeared before him in the immigration court, and I've asked him that very same question. And in his defense, what he says is, I get asylum applications from people who are in custody. He's the in-custody immigration judge, and so a lot of people are just throwing in applications just to try to slow down their deportation. It's not like somebody who's filed affirmatively and then gets referred to the out-of-custody court. So I see. So we've got a selection bias here in terms of the cases that come before him. What is your understanding of the relationship between the adverse credibility finding and the ultimate conclusion? I mean, he said the adverse credibility finding was largely on this material about leader versus member of the gang. Was that — but he also said he didn't actually bring in any of these petitions. They filed for other people and that the whole thing was implausible because they would have — if they wanted to kill him, they would have killed him, essentially. Right. And so what is your — is the material about the leader-member thing determinative or it's just part of a larger determination that he was not believable? Well, I think the immigration judge looked at this record, this evidence, and made a determination that I don't think supported. And I think the board in its first decision looked at it and made the same decision. Mr. Naharu-Portal was always very open that he joined the gang when he went into prison, and he went because those were his friends. He knew some of the people and they offered him protection. Then with the help of this judge that was overseeing his custody, his stay, she referred him to some of these legal courses. And I'm assuming because literacy is not that great in El Salvador, he was literate, so he took these courses and began writing briefs and writs on behalf of his fellow prisoners. And that's what the judge said. But she — I mean, there's no evidence of that other than what he said. Exactly. But the judge who — again, this is hearsay testimony through Mr. Mira. When he went to El Salvador and interviewed her at the point where she said, I can't testify in your case, but she told him that it would not be unreasonable because those writs are written in the name of the Petitioner. So there's no way they would be tracking back to him. In any event, the issues you were raising did not pertain only to him. I mean, we do have a bunch of petitions. Right. And, well, they're in his name, but, for example, some of the responses were more generic responses, according to this judge. So he would say they're not giving courses to the MS gang, and she would — to me as a member of the MS gang, and then she would go and say you have to give courses to the MS gang in general. And I don't know what happened to that, but it was raised in general. It wasn't raised just for him. Right. But the only writs or petitions that are in the record are those ones that were associated to him. But his testimony was that he was doing this for others. Well, I understand that. I'm trying to find out whether it really matters that much, whether it was — as to his general notion that they were after him for raising issues about the state of the prisons, whether we don't have — because we do have a bunch of petitions where he did that, although in his own name, not for other people. Right. But as a result of his advocacy, he was mistreated. He was tortured in the prison. And the record shows that he was — he had his books taken away from him. He had threats made against him if he didn't stop. Well, neither of those are torture. He was handcuffed. He was clubbed. He was put into a cell where he couldn't lay down for one month, right, where he was forced to stand. And that's at the administrative record, page 646. He was beaten on the soles of his feet. And let's see here. I'm just looking at the list here. Jaw was broken. His jaw was broken. He was hit with high-pressure hoses. And so all of these things happened in court. And now the judge says, well, the prison authorities didn't kill you, therefore that's evidence that they're not going to kill you if you go back. I mean, that's in essence what his reasoning is. Let's hear from the government, and then you'll have a little time to respond. Okay. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, Andrew Nsinga on behalf of the Attorney General. The actual record evidence in this case, as opposed to Petitioner's speculation, does not compel reversal of the agency's denial, withholding, and cat deferral. For withholding, the Salvadoran criminal records reflect that multiple people identified Petitioner as an armed robber. That record does not compel the conclusion that there's not probable cause. For cat deferral, there are various inconsistencies and accuracies that Petitioner consistently fails to address. And those constitute substantial evidence when considered together that supports the agency's determination. Well, aside from the member gang leader issue, which we can deal with in a minute, what else? That was relied on by the BIA and the IJ. The substantial evidence, first of all, Your Honor, I think what we need to back away from is Petitioner suggesting that somehow that we don't review this together. The agency, and particularly under Real ID, this Court reviews under substantial evidence standard and looks at the totality of the circumstances. So whether or not Petitioner's inaccuracies and consistencies are in four general areas, that he kept insisting, mitigating his culpability that he was not a gang leader, despite all the evidence that he was, the fact that he comes to court with a – No. I'll get to that in a minute. So go ahead. What else? That's what I'm asking. That he comes – but we can't consider them in isolation, Your Honor. I'm not talking about isolation. That he comes to court – I'm asking what else there was. Go ahead. That he comes to court with a witness who's previously submitted a statement and has that witness recant, but recant in a way that makes nonsense out of the statement, that then he claims he's this human rights crusader. He's filing petitions for all these people. He said he's filing essentially for the entire prison population. But he can't produce a single one. There's no evidence to corroborate that whatsoever. Well, first of all, two things. Why don't you finish? Go ahead. And finally, Your Honor, I think it is important to remember that Petitioner possessed a thousand-page record, and he can have all the excuses why he didn't get translated, and that is fine. But what he presented to the immigration judge then was the best of the record, and the best of the record contradicted his own testimony. So – How did it contradict his own testimony? Well, so to begin with, Your Honor, it's not merely about whether he's a gang leader or gang member. Frankly, whether he is or is not is, frankly, irrelevant. The issue is when an adverse – when the agency based an adverse credibility determination on an inconsistency, that is substantial evidence to support the agency's decision. So Petitioner – Well, first of all, whether he was a gang leader or a gang member isn't relevant to the CATS issue directly, right? It is relevant, Your Honor, because essentially it reflects even pre-real ID, exaggeration has always been a part of adverse credibility for a fact-finder. So when Petitioner attempts to suggest, well, look, all this stuff that happened had nothing to do with my being a gang leader, I was following these writs, I'm a crusader, but then he submits evidence from four people, four different times, that reflect that people – that he was a gang leader. That is contradictory to his testimony. But we have evidence, hearsay, evidence through Mr. Mira that the judge in the prison, Judge Torres, says that they kill gang leaders when they get out of prison. Your Honor, I'm not – I would hesitate – I would request a bit of caution with suggestions about what Mira said, because I do not recall Judge Mira said that. Well, wait a minute. Let's back off for a minute. It is hearsay. But for the moment, let's treat it as true, and then we can back off and say, well, but it's hearsay and so on. We have a testimony from Mr. Mira that the judge tells him that gang leaders are killed. So whether he's in trouble because he's representing others or because he's a gang leader, it comes to the same thing, that is to say there's a high likelihood that he will be killed upon release from prison. No, Your Honor. I think that reflects – Where does the no come in? Okay. Why is that a no? Because that reflects, as Petitioner has presented in this course, a misunderstanding of adverse credibility determination. In the immigration judge's decision, he cites this Court's decision in Aiden and says the real ID made this immigration proceedings more like normal court. When we don't know what occurred, then we don't give someone a cat deferral because we don't know what occurred. He has the burden of proof. Wait a minute. Hang on. I'm still working on this one. So we don't know whether he's a gang leader or not. The IJ concludes he's a gang leader. No, Your Honor. Wait a minute. Please, let me finish. If he is a gang leader, we have testimony through Mr. Mira, hearsay from Torres, the judge, that gang leaders are killed. So I understand that it's hearsay and that we can't attach the normal weight to it because he's not here testifying, but I now get some evidence that gang leaders are killed. So what difference does it make whether he is or is not? The problem is we don't know. We don't know what? We don't know what he is. We don't know what he did. We don't know. We know very little. We know for sure that he's in a gang. The only matter in dispute is whether he's a leader or not. You see, that misunderstands the nature of this dispute, Your Honor. This is not whether he is a gang leader or is a gang member. The issue is when the question the real question is what's the likelihood of his being killed if he returns to El Salvador? Well, the determination by the agency is he's not credible. So as the immigration judge said, we just don't know. Your basic argument is because of the he said he was a gang member and he could have found he was a gang leader, everything else he said is to be disbelieved. Everything else is just irrelevant. No, Your Honor. That is not the argument. The argument is that when we look at the totality of circumstances. But you're saying in terms of the adverse credibility finding, you're saying we could therefore disbelieve everything he said. That is the nature of an adverse credibility determination, that when we don't know what the evidence really means, because petitions mean inaccurate. But isn't there a point at which, I mean, we have a certain amount of corroboration of what he said. He did have a broken jaw. His mother said he had a broken jaw. His girlfriend said that when he came home, they put him, they took him to this place where the gangs were and they stripped him and all that, and he came to her house. We have the fact that he did file a lot of petitions which dealt generically whether they were in his name or someone else's name, which dealt generically with prison conditions and that they did make a difference and that some of the prison officials therefore were made to look bad. Is everything I said so far so? Your Honor, this is exactly the problem in an adverse credibility determination is Your Honor's walking down the road to speculation. Where's my speculation? All these are possibilities. Excuse me. What I'm doing is I'm looking at evidence that isn't his testimony. What the Court has to do is look to the agency's determination because the agency is a fact finder. But did the agency look at all of this? Yes, Your Honor. And? But when they looked at his evidence, they found — And the conclusion, for example, was that the girlfriend was hearsay. Well, the prison officials were hearsay, too, and the school — and the psychologist was hearsay, too. Everything in this case was hearsay. Your Honor, as this Court has recognized in Angola, everything in immigration proceedings tends to be hearsay. Right. So therefore, when the district — when the I.J. says I'm not going to believe what the girlfriend said because it's hearsay, isn't that just an impermissible determination where you're crediting a bunch of other hearsay? No, Your Honor. That's the nature of fact finding, is the agency, the immigration judge, in the first instance — But he didn't say I don't believe her for some other reason. He said I don't believe her because it's hearsay. Your Honor, the immigration judge has to, in the first instance, evaluate that evidence. So it's okay for the immigration officer to say that I'm going to believe some hearsay despite being hearsay, another hearsay I'm going to throw out because it's hearsay? Your Honor, that's the nature of fact finding, whether it's a district court or a jury, that the fact finder has to look at evidence to decide what he's going to give them — he or she is going to give them the most weight to. And what you have — In front of you, that makes sense. Or if he had said I'm not going to believe the girlfriend because it was his girlfriend, but that's not what he said. He said it was because it was hearsay. Well, Your Honor, what we — what the agency focuses on, because Petitioner is standing there testifying, is about the nature of his involvement in these activities. So — And I'm saying that there was a fair amount of corroboration of what he was saying. Was that not so by other people? There is some corroboration, absolutely, Your Honor, but that's not the nature of this Court's inquiry. The Court has to find that the record compels the conclusion first that he's credible. But because he's inconsistent in his own testimony and consistently attempting to paint himself as a human rights crusader versus a gang leader who's being transferred because of his activities, the agency — But even — tell me what statement you're relying on, that he was transferred because of his gang activities. There were two, as far as I can tell. There were two in March of 2003, where — None of them seem to be actually consistent with what he was saying, pretty much. Let me see if I can find them now. Do you remember what pages they were? They were paged on 955 and 959, or at least — there are multiple copies, Your Honor, but it's — So the 959 one says, the mentioned inmate as participating in inciting his gang and provoking the prisoners of the general population, which seems to be saying that he's provoking everybody. Right? It doesn't say — that's what it says. And it doesn't specifically say that he was a leader. That's one of them. And then — Well, Your Honor, I'm not quite sure where — That's the one in 59, 959. That's — it's in multiple places in the record, Your Honor. I'm sorry, what? It's in multiple places in the record, Your Honor. I have the 959. The other one — 955, I believe. 955 says that he was urging the rest of the inmates who were in gang MS and to participate in death threats. So the — the urging the inmates who were in the gang MS was consistent with what he was saying. He was urging them to complain about things. So the only court is the part to participate in death threats. Your Honor, again, that's — that's the danger of adverse credibility determinations. The court does not get to look at the evidence and decide in the first instance about how to interpret it. The agency has to first be — But I can't decide whether what the — what he found reflects substantial evidence. Well, then, Your Honor, even if we back away from the prison statements, well, then we can look at the psychologist's statement. And that's an interview with Petitioner himself. And Petitioner tells this psychologist that there might be issues about him transitioning back to normal life because he is, and the psychologist put it in parentheses, this, according to him, a gang leader. No, no, that's not — that's not precisely what that says. That's not what he said. He's known as a gang leader. That's different from saying he is a gang leader. Your Honor, I think that's — again, that's — this Court can't interpret the agency's evidence in the first instance. I'm just reading the evidence. I'm not talking about the agency interpret it. And it's all through translation from Spanish. So please be accurate in terms of what you said. He did not say I was a gang leader. That's not what's there. Your Honor, I think that's the fair implication. That's the inference that the agency drew. Implication versus what is there is different. Let me say something else. I want to just kind of deal with this. On page 15 of your brief, you talk about Jeannie Rickers, who — and I'm just quoting from your brief — Certainly, Your Honor. — who recounted various abuses in the prison system. But she did not remember Naharu Portol except his nickname, Pink Floyd. Do you stand by that statement? I believe so, yes, Your Honor. She remembered him very clearly. You cite me to 645 in which she says, well, if you told me you were talking about Pink Floyd, I would have known who you were talking about. She remembered much more than his nickname. You say she remembered nothing about him except his nickname. And if you look at her statement, her affidavit, she's got a long statement about him precisely. So you're just wrong. Well, then, if I'm wrong, Your Honor, I apologize. But it does not change the fact that his evidence is inconsistent. But what it tells me is that you're not careful about what is or is not in the record. Your Honor, the difficulty in the cases that are so factually intense is not an attempt to mitigate if that is an error. I apologize. But the reality of it is — Excuse me. It's not if it's an error. I'll read to you, if you want, precisely what she — what the testimony is. This is now on the page that you cite. This is now Mr. Mirren. Certainly, Your Honor. When I first spoke to her in May, she didn't specifically remember Mr. Portol. And when I met with her, she said to me, well, the problem is you told me Portol. You should have said Pink Floyd. Apparently, when it comes to the people she worked with at the time, they mostly went by nicknames. And I'm now on page 697 of the record. I've got paragraph 14. This is, again, Mr. Mirren describing precisely what Ms. Rickers says about Pink Floyd or Mr. Portol. So she remembers much more than the nickname. Yes, Your Honor. What she remembers, she filed complaints. And that's all we have, is they filed complaints. But what I'm after is you're not saying if I made a mistake. Then I made a mistake, Your Honor. But the government relies on people to actually raise issues to the agency. And what Petitioner comes before this Court with is primarily speculation. So even if we're going to ignore those, his own witness in the United States testifies, submits a statement, says he was a gang leader, he told us that. Then he came to church and he became a good man. But then when that actually becomes an issue, he brings a witness in. And then the witness says, well, you know, what I meant was he was a church leader before. Except that makes the statement become — But what this person is, he doesn't — I mean, he's completely peripheral to the situation. I mean, there were a bunch of other people who said he was a church leader. And this guy is reflecting his understanding of what this guy had sometime said to them in some imprecise fashion. But what difference does it make? What difference does it make is what the evidence actually is versus what he wished it had been. What the evidence actually was is the witness said he was a church leader. And he would submit that as, like, why belief in God made him a better person. Right. That's his statement. And if he had said — if the word had been member instead of leader, he couldn't have said exactly the same thing? He could have. But that's the evidence. Petitioner does not get to walk away from his — And is there a difference between a member and a leader, some sort of calibrated thing that you can tell the difference? Your Honor, that was his evidence. If he chose to call himself a gang leader, that would be a different case. But the court has to confront the evidence before it and the decisions before it. I just want to ask a different question. This case is unusual in that the board remanded to the I.J. and actually said essentially about the gang leader, gang member thing what I'm now saying to you now. Right? And he said they said it's, you know, these people who said this were sort of peripheral and it's an indistinct distinction and it's essentially not worth very much. It goes back to the I.J. He says basically the same thing. And now they say, oh, it's fine. Now, isn't that odd? No, Your Honor. Every analysis and every decision, if I may answer, falls on its own on the evidence before the immigration judge. When it came back to the immigration judge, Petitioner chose to submit this new witness and testify and say, well, that's not actually what I meant. But then so what you have now is multiple people calling him gang leader, him suggesting, no, no, I wasn't. In fact, I didn't even know that gangs were involved in crime. I just heard that on the news. At some point, his changing evidence, when it goes back to the agency, raises more red flags  I'm going to focus on what I think is the determinative issue on this CAT question, and that is what is the likelihood of his being tortured and killed upon his return to El Salvador? That's the central question, correct? Well, Your Honor, the preliminary question and most — No, no, no. The ultimate central question that we have to determine is what's the likelihood of his being tortured upon return to El Salvador. Is that right? No, Your Honor. The primary question, the initial question is always — I don't want an initial question. The ultimate question upon which he either does or does not get relief is what's the likelihood of his being tortured upon return? Is that right? No, Your Honor. So what is the question? The question is whether or not he's credible. No. That's the first issue. Whether he's credible or not is not the question that is the ultimate question. He gets relief or does not get relief based upon the likelihood of being tortured upon return to El Salvador. That's the criterion under CAT. CAT doesn't say if you're credible, you win. If you're not credible, you lose. No, Your Honor. That's not the regulation to say that if you're credible, you win, if you're credible, you're not. But like this Court recognized in Aiden, sometimes honest people lie and sometimes liars tell the truth. So the initial — So you're telling me the criterion for CAT relief is not the likelihood of being tortured? That's the ultimate issue, Your Honor. But the preliminary issue that the agency — Well, I'm glad we finally agree on that. All right. Let's assume we — in an exercise of overkill, threw out everything he said. Okay? We're not going to take anything he said. We're just going to go in the documents and what other people said. Would that not be enough for CAT relief? Why not? No, Your Honor, because, again, we just don't know exactly what is going on in the situation. Petitioner essentially just speculates, well, the prison system is bad, so I'll go get arrested and this. It's just a line of speculation about what we — But it's undeniable that he did raise with this ombudsperson over and over and over again. Twice. No, not twice. I saw — The evidence was twice, Your Honor. It wasn't twice. Well, okay. I won't go count, but I believe — No, Your Honor. All — what I'm saying is that he submitted to them. That's what we have evidence of, that he didn't like prison conditions. But we also have the ones where she — where she reported that he talked to her. So there's the ones where he actually wrote and then there were the ones where — where Judge Astrid Torres says he complained to me and now I'm complaining to you, which were different, as I understand it. But let's not — We don't know. They were — they were in his name, but they dealt with larger conditions that didn't only pertain to him. Is that correct? Electricity and classes and law books and so on. Drinking water. The evidence is vague, Your Honor. And undeniably — The evidence is vague about it. We don't know exactly the nature of the complaints. We don't know how they were received. We don't know because he possesses a thousand-page criminal record that he chose not to submit. He does not get to create vagaries and then demand that the government protect him. This chose not to submit stuff puzzles me. Any lawyer has, in preparation for a case, a lot of stuff. And any lawyer who submits all of this stuff is not practicing law in the ordinary sense. He submits a fair amount of stuff. He submits the best, apparently. Pardon me? Apparently he submits the best, and that's all we have. And maybe if there's some bad stuff in there, why doesn't the government ask to have a look at it? I mean, he's not required to submit everything. He submits the stuff that's there. He says this is true. Did the government ever ask to see it? The immigration judge asked to see it, yes. That's not my question. Did the government ever ask to see it? The Department of Homeland Security, I'm not aware that they did ask to see it, Your Honor. No. I'm aware of no obligation on someone to submit an entire file when it's got a whole bunch of documents. I understand that if I've got one medical record, I'm not supposed to submit paragraph 2 without the entire document. But to have an entire file that's in a case where the lawyer is not being paid anymore and to have the translator from the Spanish, that strikes me as an unreasonable request on the part of the IJ, and it strikes me as unreasonable on the part of the IJ to hold it against him that he doesn't do it, specifically when the government makes no attempt whatsoever to get their hands on it itself, for the government to indicate that there's something unfavorable in there as distinct from irrelevant. The immigration judge did not hold it against Petitioner. Well, of course he did. That's exactly why you're raising it. No, Your Honor. What the issue is is that he has a responsibility to corroborate, particularly when he's being found not credible. And that actually goes to Petitioner's complaint that he raises for the first time to suggest bias. This Court's required the immigration judge to put aliens on notice when there might be credibility concerns. It's not bias. He's doing exactly what this Court asked him to do. I notice there's some concerns here. You know, I'm a little bothered by this. You've got to submit some evidence. Then when you possess a 1,000-page record, it would behoove you to present it. And when you don't present it, we're not going to assume that the vagaries that you suggest are possibilities and speculation. That's not how I read what the I.J. did. As I read what the I.J. did, he says, if you're not going to give me the whole thing, I am going to use that as an undermining of what you have submitted. Your Honor, he found that he was not credible primarily based on the inconsistencies and accuracies. But then comes along the corroboration requirement, which even if he is credible, the agency is allowed to request as long as it's reasonable. And he possessed it. He possessed it, and he chose not to submit it. But he chose not to submit it because he said, I've submitted to you the corroborating materials. I don't want to go to the expense of translating all the rest of it when I do not view it as helpful to my case. Your Honor, it's fine that he does not want to pay the money to do it. Then he should at least proffer. He should do something. At this point, again, I'm just speculating about what he could have done. We don't know what he could have done because we just don't have the record. Well, we did do. Well, we know what we did do. The fact that he didn't submit the rest of it shouldn't be held against him. Your Honor, Congress made corroboration a requirement. You know, I don't think you and I are speaking the same language. You're running away from what I think the IJ did. The IJ, in my view, held it against him that he wouldn't submit the whole thing and used the fact that he wouldn't submit the whole thing as a way of undermining that which he did submit. Your Honor, Petitioner has never raised such a claim. And so — He doesn't have to raise the claim. I'm just reading what the IJ said and what he wrote. Your Honor, I'm not aware of anything that could be fairly read to suggest the immigration judge is punishing someone for filing that. Again, that seems to suggest bias. The Petitioner has never raised a claim that the immigration judge was biased. I'm just reading footnote 2 in your brief. You seem to be suggesting that there's a problem. Immigration judge noted that one of Navarro-Portal's attorneys had taken the TANDIS, testified that he had a 1,000-page criminal or prison record from El Salvador but not submitted it. Because the file would contain more information, the immigration judge requested that Navarro-Portal submit that record. Navarro-Portal did not submit any record. Well, that's wrong. Yes. He did submit some. He just didn't submit all of it. Well, Your Honor, wrong or not, it does not matter. Because the reality is when Petitioner comes to this Court and claims there's a lot of uncertainty in this case and this Court should just not conduct a substantial evidence standard review and just, well, all this stuff is possible, right? When he has a record, the record can't compel the conclusion when he chooses not to put stuff in that record. The immigration judge does not hold it against him, but he does have a requirement to corroborate a claim, particularly when he's not credible. And substantial evidence supports that determination. Okay. Thank you. We'd ask the Court to deny the petition. Do I have a couple of minutes for rebuttal? You've got one minute and 51 seconds. And however long, we take you over that. Well, thank you, Your Honor. I just have really one point. I wanted to address the ultimate question that's before this Court, and that's whether Petitioner has established he was more likely than not to be tortured if he's sent back to El Salvador. And I just wanted to, you know, my learned colleague, I think, had it incorrect, because there's a case from this Court, I'm not sure how to pronounce it, Shrestha V. Holder, S-H-R-E-S-T-H-A, that says an adverse credibility determination is not necessarily a death knell to a cap protection, and that's 590F3-1034-2010. So the question really is, is Mr. Naharu-Portal going to be tortured or killed if he's returned? That's the ultimate question to El Salvador. And I think the fact that he has been sitting in custody since 2011 and is waiting for protection under the Convention Against Torture speaks volumes, at least to his fear, that he's going to be killed if he is returned to El Salvador. Is he in custody now? Yes. How come you didn't say it on your brief? I thought I did at the front. I'm looking. Well, there's a declaration page in there that says the custody status. What's it supposed to say on the cover? Well, it's an oversight. So he's been in custody waiting for protection under the Convention Against Torture. He fears going back to El Salvador. I mean, this is life or death for him. So it's not an academic exercise. This is a matter of life or death for him. And with that, I'll submit, unless there's any further questions. So thank you. Naharu-Portal v. Lynch, submitted for decision.
judges: Fletcher, Berzon, Bea